# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 17, 2009

## STATE OF TENNESSEE v. DANA KENNEDY WALLS

**Direct Appeal from the Circuit Court for Warren County**
**No. F-11580     Larry B. Stanley, Jr., Judge**

---

**No. M2009-00736-CCA-R3-CD - Filed December 7, 2010**

---

Defendant-Appellant, Dana Kennedy Walls,[1] was convicted by a Warren County Circuit Court jury of facilitation of initiating a process to manufacture methamphetamine in count one, a Class C felony; facilitation of promoting the manufacture of methamphetamine in count two, a Class E felony; and promoting the manufacture of methamphetamine in count three, a Class D felony. She was sentenced as a Range I, standard offender to serve concurrent sentences of five years with service of 365 days in confinement for count one, two years with service of 90 days in confinement for count two, and three years with service of 250 days in confinement for count three, for an effective sentence of five years with 365 days in confinement prior to serving the remainder of her sentence on probation. On appeal, Dana Walls argues: (1) the evidence was insufficient to support her convictions, (2) the trial court committed reversible error in failing to instruct the jury on the lesser included offense of attempt for each of the charged offenses, and (3) her sentence is excessive. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Ricky L. Stacy, McMinnville, Tennessee for the Defendant-Appellant, Dana Kennedy Walls

---

[1] The trial transcript shows that, prior to the start of trial, the Defendant-Appellant informed the trial court that she had "never been a Walls." Shortly thereafter, both sides agreed to amend the indictment to show the Defendant-Appellant's name as "Dana Kennedy" rather than "Dana Kennedy Walls." Despite this agreement, her name was never corrected on the indictment and no amended indictment appears in the record. However, the Defendant-Appellant is referred to as "Dana Kennedy" throughout the trial transcript, and the judgment forms and the notice of appeal show the Defendant-Appellant's name as "Dana Kennedy." Because it is the policy of this court to use the name of the Defendant-Appellant as it is listed in the indictment, we will refer to the Defendant-Appellant in this case as "Dana Kennedy Walls."

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Thomas Miner, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** J., the sixteen-year-old daughter of the Defendant-Appellant, Dana Kennedy Walls, testified that prior to September 12, 2006, she lived with her mother and her mother's boyfriend, Tony Walls. J. said that she currently lived with her foster parents, Duane and Kirsten Farmham, who were in the process of adopting her. She stated that her mother worked at Great Western Bag Company and Tony Walls did not work because he was disabled.

J. said that she arrived home on September 12, 2006, to find police officers at her home, and she assumed that Tony Walls had been arrested for driving without a license again. J. said that she was sent to live with Barbara Mullican, a family friend, for a period of time following her mother's and Tony Walls's arrest. During that time, she spoke with individuals from the Department of Children's Services (DCS), who asked her if she was aware of any criminal activities taking place in her home. J. told DCS that she was not aware of any criminal offenses there. During her testimony, J. acknowledged that she did not initially tell the truth to DCS. She said she was afraid that if she said anything to DCS, her mother would be sent to jail, and she did not "want to feel like [she had] betrayed her." A short time later, J. talked to DCS again and told them the truth about her mother's and Tony Walls's involvement in the manufacture of methamphetamine. J. said that she had told DCS that she had seen her mother and Tony Walls cooking a liquid in a pan in the microwave and then skimming a substance off of the top layer of the liquid and then cooking again. Although J. could not identify the substance they were cooking, she was sure that it was not food. J. said that her mother asked her to help pull off the striker pads from matchbooks and put them in a bowl, but she refused. J. later saw these striker pads soaking in a liquid in the bedroom shared by her mother and Tony Walls on several different occasions. She also remembered going with Tony Walls a couple of times to purchase large boxes of matches.

J. also stated that she would occasionally go with her mother when her mother purchased cold medication. She recalled one incident in which she went with her mother to buy cold medication at Walmart. She said that her mother "attempted to get too many [boxes of cold medication] and [the employee at the pharmacy] told her that she could not have that many at a time." J. said that the cold medication was packaged in "little individual squares where you can just pop them out of the wrapper." J. said that her mother and Tony Walls crushed the cold medicine and placed it on coffee filter paper. When asked how many boxes of pills they crushed, J. replied, "I can't give an exact number. It was several. More than

three." She said that she saw "jars of all different sizes" with "some clear [and] some cloudy" liquids inside. She also remembered Tony Walls telling her not to touch a particular jar of liquid because it contained acid. She said he showed her what would happen when the acid touched a piece of aluminum foil to demonstrate the dangerousness of the acid.

On cross-examination, J. acknowledged that she never told her aunt or her grandmother about her mother's and Tony Walls's criminal activities at their home. She acknowledged that she never wanted to go back and live with her mother and that she wanted to stay with the Farnhams, who were planning to adopt her. J. said that she could not recall the exact date that she went with her mother to purchase cold medication at Walmart, although she said that it occurred less than a year before her mother's and Tony Walls's home was searched by the police.

Sergeant Bill Davis of the McMinnville Police Department testified that on September 12, 2006, he was notified that sanitation employees had found some suspicious trash at the residence shared by Dana Walls and Tony Walls. Sergeant Davis and Det. Jenkins searched the trash and discovered a large quantity of matchbooks with the striker pads removed and a letter addressed to Dana Walls from the Food Stamp Administration. Upon finding these items, Sgt. Davis obtained a search warrant for the Walls' residence. Prior to obtaining the search warrant, Sgt. Davis said that he and Det. Jenkins went to the Walls residence to knock on their door, speak to the residents, talk to them about what they found, and ask for consent to search their home. When they arrived at the home, there was no one present. Sergeant Davis decided that a search warrant was needed, and he asked another officer to guard the area until he could return with a warrant. Dana Walls arrived at home prior to the time that Sgt. Davis returned with the search warrant. Sgt. Davis went back, spoke to her briefly, and she consented to the search. However, Sgt. Davis said that because he had already begun the search warrant process, he waited to search the home until he received the warrant. During the nine-hour period that Sgt. Davis was at the home, he never saw Tony Walls. During his search, Sgt. Davis found a one quart jar with striker pads soaking in liquid in the bedroom shared by Dana and Tony Walls. He explained that the liquid would cause the red phosphorous to separate, and red phosphorous was "one of the key ingredients to make methamphetamine." Sgt. Davis also found "two zip bags, one with white powder in it and one with a red powder in it [which] was located in the second from the top dresser drawer on the left side." These bags were submitted to the Tennessee Bureau of Investigation (TBI) Crime Lab. He also found latex gloves, a set of digital scales, and a couple of razor blades. Sgt. Davis said that scales are often used to weigh the different ingredients in methamphetamine as well as the finished product and razor blades are used to "scrape the dried methamphetamine out" of its container.

On cross-examination, Sgt. Davis acknowledged that Dana Walls consented to the search of the home and was cooperative during the search. He also said that the powders, gloves, and baggies were found on the men's side of the dresser in the bedroom. Sgt. Davis said that Dana Walls refused to make a statement after being arrested; however, prior to her arrest, she told Sgt. Davis that "she didn't know anything about anything going on [at the residence she shared with Tony Walls]."

Robert Young, a Special Agent Forensic Scientist with the TBI Crime Lab, tested the white powder and red powder found at the Walls residence. He stated that the white powder weighed .4 grams and tested positive for pseudoephedrine, which is a precursor to methamphetamine. Agent Young said that the red powder weighed 1.8 grams and tested positive for methamphetamine. He stated that the red powder was a "post-reactive substance, which is probably either red phosphorous or a combination of red phosphorous and residue iodine.

Detective Tony Jenkins, the drug and narcotics investigator for the McMinnville Police Department, assisted Sgt. Davis with the investigation of the lab found at the residence shared by Dana and Tony Walls. Detective Jenkins stated that he often sees large numbers of matchbooks in clandestine methamphetamine labs because "one of the three ingredients you need to make methamphetamine [is taken] from the striker plates [of matchbooks] and that's red phosphorous." He said that the red phosphorous is obtained by taking the striker plates and soaking them in a solvent. He said this process of soaking the striker plates was consistent with the jars of liquids found at the Walls residence. Detective Jenkins stated that another critical ingredient to methamphetamine was pseudoephedrine, which can be obtained by buying cold medication and extracting the pseudoephedrine from the pills. He said that cold medication with pseudoephedrine can only be obtained in pharmacies, and a person can only purchase nine grams in a month. He explained that a person can use cold medicines to make methamphetamine by crushing the pills and soaking them in a jar with a solvent, usually denatured alcohol like Heet. He stated that often this solution is cooked, which causes the ephedrine to be suspended at the top of the solution where it can be removed. Detective Jenkins said that he discovered a container of Heet on the floorboard of Dana Walls's car. He also found the bottom of a jug that had appeared to have iodine stains on it, which was important because iodine is also one of the ingredients to make methamphetamine. He said individuals put an iodine mixture into a jug with hydrogen peroxide and acid, which causes iodine crystals to form. Then the jug is cut open to get to the crystals. He said that Heet is legitimately used for an engine lubricant in winter, but the bottle of Heet was found in Dana Walls's car when it was still warm outside. Detective Jenkins said that he also found acid in the tool box on the porch of the residence. He said acid is used to "salt" the methamphetamine out of the methamphetamine oil.

-4-

Leslie Lawrence, Dana Walls's sister, testified that she lived with her sister approximately three years prior, and she never observed anything that made her believe that she was involved with methamphetamine. Lawrence said that she believed that her sister was a truthful person even though her sister had been convicted for passing a worthless check. She said J., Dana Walls's daughter, never said anything to her about her mother using or manufacturing drugs.

Donna Joyce Lawrence, Dana Walls's mother, testified that she believed her daughter was telling the truth when she said that she did not use or make methamphetamine. She also said that J. never said anything to her about Dana Walls using or being involved in the manufacture of methamphetamine at her home.

Tony Walls testified that he and Dana Walls had lived together for the last ten and a half or eleven years. He stated that he was in Murfreesboro with his father, who was receiving radiation and chemotherapy, the day that Dana Walls was arrested. Prior to going to Murfreesboro, Tony Walls put 150 striker plates in a pickle jar with alcohol after Dana had left for work. Tony Walls referred to his statement to police, in which he said that Dana Walls and J. were not aware that he was manufacturing methamphetamine. He stated that he entered a guilty plea in this case, served eight and a half months in jail, and received a sentence of eight years on probation. He stated that the red phosphorous, latex gloves, digital scales, and razor blades belonged to him. He also said that he would manufacture the methamphetamine while Dana was at work and J. was at school. Tony Walls denied cutting striker plates off of matchbooks in J.'s presence. He said that he began manufacturing methamphetamine after he became disabled.

On cross-examination, Tony Walls maintained that the police did not find a "full blown lab" at his home. He also said that J. was not telling the truth when she said that she saw him and her mother removing the striker plates from matchbooks and saw striker plates soaking in alcohol. However, he acknowledged that he had been convicted of two counts for theft under $500 and four counts of passing a worthless check.

Dana Walls, the Defendant-Appellant, testified that she consented to the police searching her house because she "[had] nothing to hide." She said that she had never seen the jar of soaking matchbook striker plates or the bag of red powder until she was shown the pictures from the police's search of her home. She also said that she never went in Tony's drawer where the other items related to the manufacture of methamphetamine were found. Dana Walls claimed that the digital scales were used to weigh envelopes for postage because her daughter often wrote her friends. She claimed that she has never used methamphetamine or any other kind of drug. Regarding the worthless check charge, she claimed that she had closed her bank account and believed that she had enough money in her account to cover the

outstanding checks. She said that she ultimately pleaded guilty to the charge to avoid missing work. Dana Walls stated that she did not have any reason to suspect Tony Walls of making methamphetamine. She also said that she never assisted him in manufacturing this drug and never removed the striker plates from matchbooks. She claimed, "I wouldn't have worked the hours I did and worked two jobs at a time sometimes if I was sitting there selling drugs [and] making money." She claimed that her daughter's testimony was not truthful and that her daughter had told her that "she would do whatever it took and say whatever she had say to get to stay [with her foster parents], no matter what the consequences [were] for me."

Kathy Bell, Tracy Watson, Vince Boren, and Sherry Hallum, who all worked with Dana Walls at Great Western Bag Company, testified that Dana was a good employee, appeared to be a truthful person, had a strong relationship with her daughter, and did not appear to be using drugs.

**Sentencing Hearing.** Jennifer Craighead, an employee of the Tennessee Board of Probation and Parole, testified that Dana Walls had been on probation for a prior worthless check conviction from November 2005 when she was arrested in the instant case. Craighead also said that Dana Walls had a prior conviction for DUI in November 2002, which resulted in supervised probation. In June 2003, Dana Walls had a violation of probation warrant issued against her because she failed to report her employment and failed to pay fines and court courts associated with her DUI case. Craighead said that this violation was ultimately dismissed because Walls obtained employment and brought her payments on the fines and court costs up to date. She also stated that Dana Walls had previous misdemeanor convictions for theft, disorderly conduct, and leaving the scene of an accident.

Patricia Gibbs, Dana Walls's aunt, and Tracy Watson and Sherry Hallum, who worked with Dana Walls, testified they never suspected Dana of using or manufacturing methamphetamine. They also said that Dana had a good relationship with her daughter, appeared to be a truthful person, and seemed to be a good candidate for probation.

Donna Lawrence, Dana Walls's mother, testified that Dana was an excellent mother to her daughter, J. She said that she believed J. was not truthful at trial because she wanted to continue living with her foster parents, who provided her with a cell phone and an internet connection.

Dana Walls then made a statement of allocution to the trial court. During this allocution, she said, "I will never understand why [my daughter, J.] lied on me [sic] in court." She added, "I am guilty of making bad choices in men but that's the only thing I am guilty of . . . ." She also stated:

I don't understand why this has happened to me. . . . I just wish there was a way I could turn back time and prevent any of this from happening. I just want everyone to know . . . that I am sorry about the pain and sorrow and grief all of this has caused. I wish this had never happened. It's like a bad nightmare.

At the conclusion of the sentencing hearing, the trial court sentenced Walls to an effective sentence of five years with service of 365 days in confinement prior to serving the remainder of her sentence on probation. On November 5, 2008, Walls filed a timely motion for new trial and a motion for correction or reduction of sentence, both of which were denied. She also filed a motion for early release, and the trial court granted this motion and allowed Walls to be placed under house arrest for 90 days following her immediate release from the Warren County Sheriff's Department. Walls subsequently filed a timely notice of appeal.

**ANALYSIS**

**I. Sufficiency of the Evidence.** Dana Walls argues that because her daughter's testimony lacked credibility, the evidence was insufficient to support her convictions for facilitation of initiating a process to manufacture methamphetamine, facilitation of promoting the manufacture of methamphetamine, and promoting the manufacture of methamphetamine. In response, the State contends that it is not the duty of this court to reweigh evidence or reevaluate the credibility of trial witnesses. Moreover, the State argues that the jury obviously found that J. provided credible testimony because it convicted Dana Walls of the aforementioned offenses. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this Court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt through direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)), perm. to appeal denied (Tenn. Nov. 13, 1990). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v.

-7-

Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this Court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). This Court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Dana Walls was convicted of two facilitation offenses. A person is guilty of the facilitation of a felony "if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a) (2006). Regarding count 1, an individual initiates a process intended to result in the manufacture of methamphetamine when he or she "begin[s] the extraction of an immediate methamphetamine precursor from a commercial product, . . . begin[s] the active modification of a commercial product for use in methamphetamine creation, or . . . heat[s] or combine[s] any substance or substances that can be used in methamphetamine creation." See id. § 39-17-435(b) (2006). Regarding count 2, for the purposes of this case, an individual promotes methamphetamine manufacture when he or she "[s]ells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use[.]" See id. § 39-17-433(a)(1) (2006). Regarding count 3, an individual alternatively promotes methamphetamine manufacture when he or she "[p]ermits a person to use any structure or real property that the defendant owns or has control of, knowing that the person intends to use the structure to manufacture methamphetamine, or with reckless disregard of the person's intent." See id. § 39-17-433(a)(3) (2006).

**A. Facilitation of Initiating a Process to Manufacture Methamphetamine.** Dana Walls argues the inconsistencies in her daughter's testimony prevent the proof from being sufficient to support this conviction. See id. §§ 39-17-435(b); 39-11-403(a) (2006). Specifically, she cites to J.'s testimony that she assumed that police were at her home because Tony Walls had been arrested again for driving without a license, that she initially told DCS that she did not know of any illegal activity in her home, that she had seen her mother and Walls removing the striker pads from matchbooks but could not describe how they were removed, that she saw her mother crushing up pills with no proof that the pills were related to the manufacture of methamphetamine, and that she saw her mother and Walls cooking

something in the microwave but was unable to identify the substance or state whether the substance was related to the manufacture of methamphetamine.

Viewed in the light most favorable to the State, the proof supports Dana Walls's conviction for facilitation of initiating a process to manufacture methamphetamine. J. testified that her mother removed hundreds of striker plates from matchbooks in order to obtain the red phosphorous necessary for making methamphetamine. In addition, J. stated that her mother attempted to purchase more than the legal limit of cold medication from Walmart and then later crushed the cold medication she legally obtained and placed it on coffee filters. Finally, J. testified that she saw her mother heating liquid that was not food in the microwave and skimming a substance off of the top layer of the liquid.

Although Dana and Tony Walls testified that Dana was not aware of or involved in the manufacture of methamphetamine, the proof at trial does not support their testimony. First, the police found a jar of striker plates soaking in solvent, razor blades, latex gloves, and digital scales in plain view at the residence. In addition, two bags containing pseudoephedrine and methamphetamine were found in a dresser used by Dana Walls. Although Tony Walls claimed that he always kept the ingredients and the processes used to manufacture methamphetamine hidden from Dana Walls and J., he could not explain why the police found the aforementioned items in plain view on a day that he knew he would not be back to the house before Dana returned. Ultimately, the jury determined that J. was credible and that Dana and Tony Walls were not credible. As we previously stated, it is not the function of this court to "reweigh or reevaluate" the proof presented at trial. Philpott, 882 S.W.2d at 398. We conclude, based on our review of the record, that the evidence was more than sufficient to convict Dana Walls of facilitation of initiating a process to manufacture methamphetamine.

B. **Facilitation of Promoting Methamphetamine Manufacture.** Dana Walls also argues that the State failed to present any evidence that she acquired or furnished substantial assistance to another in acquiring a chemical, drug, ingredient, or apparatus used to produce methamphetamine. See T.C.A. § 39-17-433(a)(1) (2006). She argues that J.'s testimony that she observed her attempting to purchase more than three packages of cold medication does not establish that she ever acquired any cold medication during this trip to Walmart, much less that she acquired the cold medication knowing that it would be used to produce methamphetamine. See id. She argues that at trial, just after J. mentioned the trip to Walmart, the State then asked J., in a very vague fashion, if she had ever seen her mother and Tony Walls do anything with "those" pills, and J. responded that "one time" she had seen Dana and Tony Walls crushing up the pills. When the State asked her how many boxes of pills she saw them crush, J. replied that it was more than three boxes. Dana Walls also argues that her daughter failed to provide any testimony regarding the date that this trip to

Walmart occurred. She further argues that the State presented no other proof that she purchased a chemical, drug, ingredient, or apparatus used to produce methamphetamine at Walmart or elsewhere during the time period alleged in the indictment. Finally, she argues that although pharmacies were required to maintain electronic records of the sale of all non-exempt products containing precursors to methamphetamine, the State failed to produce any such evidence prior to or during trial. She claims that if such records existed, then the State should have disclosed them during discovery, and if they did not exist, then State should have disclosed their non-existence as exculpatory evidence.

We initially note that the State was under no obligation to produce electronic records showing that Dana Walls purchased cold medication in order to prove that she was guilty beyond a reasonable doubt to the offense of facilitation of promoting methamphetamine manufacture. We agree with the State that it was the jury's prerogative to accredit the testimony of J. and discredit the testimony of Dana and Tony Walls. Accordingly, the evidence was more than sufficient to support this conviction.

**C. Promoting Methamphetamine Manufacture.** Dana Walls further argues that the evidence presented at trial did not establish that she knew or should have known that Tony Walls was manufacturing methamphetamine in her home. See id. § 39-17-433(a)(3) (2006). In support of this argument, she notes her cooperation with the police, her consent to the search of her residence, and her immediate opening of her door upon being served with the search warrant. She also emphasizes that both she and Tony Walls testified that she was not aware of Tony Walls's criminal activities in her home. She also emphasizes her coworkers testimony that they never observed anything that made them believe that she was using or involved in the manufacture of methamphetamine. She claims that the items that were involved in the manufacture of methamphetamine were in "inconspicuous and hidden locations." Finally, she argues that the matchbooks were found in the garbage, the razor blades and jar of soaking striker plates were placed in the bedroom by Tony Walls after she left for work, and the jar containing acid and the bottles of alcohol were locked in a tool box for which she did not have a key.

J. testified that her mother was aware that Tony Walls was involved in the manufacture of methamphetamine and that her mother was actively involved in the processes used to manufacture this drug. Although Dana and Tony Walls testified that Dana had no idea of the criminal activities taking place in the house, Tony admitted that he left several items related to the manufacture of methamphetamine in plain view at a time when he knew Dana would return. Although J.'s statements regarding her mother's involvement in the criminal activities were inconsistent, the jury was free to accredit J.'s testimony over that of Dana and Tony Walls. Accordingly, we conclude that the evidence was more than sufficient to support this conviction.

**II. Jury Charge.** Dana Walls contends that the trial court committed reversible error in failing to instruct the jury on the lesser included offense of attempt for each of the charged offenses. In response, the State argues that since the evidence at trial showed a completed offense, the trial court was not obligated to instruct the jury on attempt. We agree with the State.

In State v. Burns, the Tennessee Supreme Court outlined the test to determine if offenses constituted lesser included offenses:

An offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

        (1) a different mental state indicating a lesser kind of culpability; and/or

        (2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

        (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

        (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

        (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

6 S.W.3d 453, 466-67 (Tenn.1999). The court held that if an offense constitutes a lesser included offense pursuant to the aforementioned test, then the trial court needs to undergo

the following two-step analysis before deciding whether an instruction on the lesser included offense is given to the jury:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469. Pursuant to the test established in Burns, "an attempt to commit the offense charged" constitutes a lesser included offense. Id. at 467. However, the trial court must still conduct the two-step analysis in order to determine whether an instruction on the lesser included offense of attempt should be given to the jury. Id. at 469. This court has also noted that "[a]n attempt instruction is not required if the only proof presented was proof of the completed crime as opposed to an attempt." State v. Biggs, 218 S.W.3d 643, 658 (Tenn. Crim. App. 2006) (citing State v. Marcum, 109 S.W.3d 300, 304 (Tenn. 2003)), perm. to appeal denied (Tenn. Dec. 18, 2006).

Here, the defense filed a request for a jury charge on lesser included offenses, which included the lesser included offenses of attempt to initiate a process to manufacture methamphetamine and attempt to promote methamphetamine manufacture. Immediately after the close of proof at trial, the court held a jury-out hearing regarding jury instructions. During this hearing, the trial court found that there had not been any evidence presented which justified an attempt instruction on any of the three charges in the indictment. In addition, the court indicated that it did not believe that the evidence presented would sustain a verdict for attempt. It determined that Dana Walls either had no knowledge of Tony Walls's criminal activities or was actively involved in the process to manufacture methamphetamine. Although defense counsel did not directly object to the court's finding that attempt should not be charged, he stated that attempt is "automatically a lesser included" offense and that the court's failure to instruct the jury on attempt could be error. The court responded:

> There aren't a lot [of cases] that get sent back because you failed to read an attempt. I'm not going to read [the jury instruction on attempt]. I don't think there is any proof that would justify an attempt [instruction]. [Dana Walls's] position is she didn't know about it, she didn't do it, period, and the testimony from the other side, if it's believed, is . . . that she was there and engaged in the promoting, buying the pills and initiating by tearing the striker

-12-

pads off. That's not attempting to do it. She either did it or she didn't do it from the proof on both sides.

In her motion for new trial, Dana Walls claimed that the court erred in failing to give a jury instruction on attempt for the three offenses charged. At the hearing on the motion for new trial, trial counsel argued that the court should have instructed the jury on attempt for all three charged offenses but particularly count two since the evidence presented at trial "dealt with [Dana Walls] attempting to procure pseudoephedrine and being unable to do so [which] would support the instruction for attempt." In the order denying the motion for new trial, the trial court found that the attempt instruction should not have been given in counts one and three. Although the trial court determined that it was error not to instruct the jury regarding the offense of attempt on count two, it found that this error was harmless, given that the offense of facilitation of promoting methamphetamine manufacture and attempt to promote methamphetamine manufacture carried the same punishment.

We agree that the attempt instruction should not have been given for counts one and three because there was only proof of a completed crime. Regarding count two, we conclude that the trial court's initial determination that the attempt instruction should not have been given to the jury based on the evidence at trial was proper. The court acknowledged that attempt was a lesser included offense. However, in conducting the two-step analysis in Burns to determine whether an instruction on attempt should be given, it found that the defense had not presented any evidence which justified an attempt instruction on any of the three charges in the indictment and that the evidence did not sustain a verdict for attempt. At trial, J. testified that she would occasionally go with her mother when her mother purchased cold medication. She recalled a specific time when she went with her mother to buy cold medication at Walmart. J. said that her mother "attempted to get too many [boxes of cold medication] and [the employee at the pharmacy] told her that she could not have that many at a time." Dana Walls argues that J.'s testimony establishes that she never acquired any cold medicine during the trip to Walmart, which would support a jury instruction on attempt in count two. We disagree. J.'s testimony indicates that she saw her mother buy cold medication on several different occasions. In addition, J.'s testimony regarding the incident at Walmart shows that Dana Walls was prevented from purchasing more than three boxes of cold medication, not that she was prevented from purchasing the legal amount of cold medication. We note that regarding count 2, an individual promotes methamphetamine manufacture when he or she "[s]ells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use[.]" T.C.A. § 39-17-433(a)(1) (2006). The evidence established that during the Walmart incident Dana Walls attempted to purchase an illegal amount of cold medication and then subsequently purchased a legal amount of cold medication "knowing that it [would] be used

-13-

to produce methamphetamine, or with reckless disregard of its intended use[.]" Id. Accordingly, we conclude that the trial court did not err in failing to instruct the jury on attempt regarding all three of the counts charged in the indictment.

**III. Sentence.** Dana Walls argues that she received a harsher sentence than Tony Walls, who entered guilty pleas in this case. She specifically asserts that although she received a shorter effective sentence, she was required to serve 365 days in confinement prior to serving the remainder of her sentence on probation while Tony Walls was only required to serve 210 days in confinement prior to serving the remainder of his eight-year sentence on probation. First, she asserts that Tony Walls had a more extensive criminal history than she did and he entered a guilty plea to a Class B felony while the most serious offense for which she was convicted was a Class C felony. Second, she argues that the proof at trial showed that Tony Walls was more culpable than she was regarding the criminal offenses in this case. Finally, she contends that the disparity in the confinement sentences is not justified and is contrary to the purposes and principles of the sentencing act.

In response, the State initially contends that this issue is moot because the trial court granted Dana Walls's motion for early release, which resulted in her having to serve only 160 days in confinement. The State also argues that the trial court considered the purposes and principles of the sentencing act before making "an individualized, case-specific inquiry in determining the defendant's sentence." We agree with the State.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant has the burden of showing the impropriety of the sentence. Sentencing Comm'n Comments, T.C.A. § 40-35-401(d) (2006). This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court may not disturb the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In this case, our review will be de novo with a presumption of correctness because the trial court properly considered the purposes and principles of the sentencing act.

Here, the trial court sentenced Dana Walls to a split sentence of confinement and probation. We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation

are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996), perm. to appeal denied (Tenn. Oct. 14, 1996). Where a defendant is considered a favorable candidate for alternative sentencing, the State has the burden of presenting evidence to the contrary. See State v. Bingham, 910 S.W.2d 448, 454 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000), perm. to appeal denied (Tenn. Oct. 2, 1995). However, the defendant has the burden of establishing suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing. See id. (citing T.C.A. § 40-35-303(b)).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. T.C.A. § 40-35-303(a) (2006). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. Id. § 40-35-303(b) (2006). In addition, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b) (2006), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. See State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (citation omitted), perm. to appeal denied (Tenn. Mar. 17, 2003).

When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, his present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. See State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing State v. Grear, 568 S.W.2d 285 (Tenn. 1978)). The court should also consider the potential for rehabilitation or treatment of the defendant in determining the appropriate sentence. See T.C.A. § 40-35-103(5) (2006). In addition, the principles of sentencing require the sentence to be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4) (2006).

Prior to sentencing Dana Walls, the trial court applied enhancement factor (1) "The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]" Id. § 40-35-114(1) (2006). Her prior history consisted of the following misdemeanor offenses: theft, violation of the driver's license law, disorderly conduct, leaving the scene of an accident, driving while under the influence, and passing a worthless check. The trial court declined to apply any of the mitigating factors suggested by the defense. Prior to sentencing Dana Walls, the trial court stated:

Ms. [Walls], you made the statement that you can't understand why this is happening to you. I can tell you exactly why this is happening to you. You moved you minor child in with someone who was manufacturing methamphetamine and your daughter testified in very convincing fashion, with no reason that I can see to lie, that you were involved with it and she knew exactly what was going on and saw it with her own eyes. Now, if you don't understand that is why you're here today you've got a real problem because that is exactly why you're here today.

Regarding the issue of probation, the court considered the following factors:

The defendant, having been sentenced to . . . ten years or less in the State Penitentiary is eligible for consideration regarding probation. I have considered the pre-sentence report, the defendant's social history, her work history, the nature of . . . these offenses, her prior criminal history, and whether or not she would abide by the terms of probation and not commit future crimes, protect the interest of society in keeping someone like this lady from being around and committing additional crimes, whether confinement is an effective deterrent in this particular situation to protect or to deter this activity from being ongoing in the future, and again, the nature of the offense.

The trial court sentenced Dana Walls as Range I, standard offender. For the offense of facilitation of initiating a process to manufacture methamphetamine in count one, a Class C felony, the sentence range is three to six years. See id. § 40-35-112(a)(3) (2006). The trial court sentenced her to five years with service of 365 days in confinement. For the offense of facilitation of promoting the manufacture of methamphetamine in count two, a Class E felony, the sentence range is one to two years. See id. § 40-35-112(a)(5) (2006). The trial court sentenced her to two years with service of 90 days in confinement. Finally, for the offense of promoting methamphetamine manufacture in count three, a Class D felony, the sentencing range is two to four years. See id. § 40-35-112(a)(4) (2006). The trial court sentenced to her to three years with service of 250 days in confinement. The court ordered that all three sentences would be served concurrently, for an effective sentence of five years with 365 days in confinement prior to serving the remainder of her sentence on probation.

Following sentencing, the trial court granted Dana Walls's Motion for Early Release, thereby allowing her to serve the remainder of her sentence on probation after serving a total of approximately 160 days in confinement. We conclude that Dana Walls's sentence was proper. Accordingly, she is not entitled to relief on this issue.

## CONCLUSION

We conclude that the evidence was sufficient to support the convictions, the trial court did not err in failing to instruct the jury on the lesser included offense of attempt for each of the charged offenses, and the sentence was not excessive. Accordingly, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE